United States v. Betancourt. Good morning, your honors. Lisa Rasmussen on behalf of Ms. Betancourt. Counsel for Ms. Granillo is also here. I understand that she wasn't listed on the calendar. With the court's permission, I'd like to talk for about eight minutes. Reserve three for rebuttal and let her speak for four if that would be okay. Thank you. This case is a Fourth Amendment issue and this stems from a Southern Nevada Interdiction Task Force stop on Interstate 15. There are a couple issues. One of the issues at the suppression hearing is discovery that was not permitted, cross-examination that was not permitted, and discovery that wasn't forthcoming. There is from the, and I think it's clear in the brief, there was an earlier stop of my client in January 2006. The stop at issue in this case occurred in February 2006. Until the day of the suppression hearing, in fact, no discovery was ever produced about the earlier stop. And in fact, it wasn't until the very end of the testimony at the suppression hearing when Trooper Martin was asked on cross-examination, do you keep records of your stops? And he said, of course. We log every stop and every contact. So what that means is that there would have been contact, there would have been information provided about, that there would have been information maintained about the January stop that was never provided to the defense in this case. At a minimum, it would have been Brady. Now the... Counsel, were you trial, the trial lawyer in this case? Yes. Well, there's a, there's a waiver with respect to what can be brought up on appeal and it isn't clear to be that the subpoenas or the discovery is part of that. The defendant waived most of her rights to appeal. She is preserving only the right to appeal the denial of her motion to suppress and any portion of the sentence. It doesn't include the motions that were denied on the subpoenas. Well, the subpoenas were issued for the suppression hearing would be my response to that and I understand... But it's not very precise. I mean, if you wanted to preserve that, you should have preserved the right to appeal the denial of those motions. Okay, well, I apologize to the court if we weren't specific. It's more than an apology. It's a question of what's here on appeal. It's a question of what can be brought up. The subpoenas to NHP, Nevada Highway Patrol, and Las Vegas Metropolitan Police Department were issued for the suppression hearing. A day before the suppression hearing, the State of Nevada, on behalf of Nevada Highway Patrol, filed a motion to quash. The quash hearing was taken up at the suppression hearing concurrently. At the end of that portion of the hearing, the district court actually asked the State of Nevada, are the documents that Defense Counsel seeks publicly available? And her response was no, they are not. So there were, I was limited in what I could cross-examine because I didn't have the documents that were requested in the subpoena. That was part and parcel of the suppression hearing. Assuming we reach the issue, how are you prejudiced in a way that you think requires reversal by the court's denial of the subpoena? Because had they brought documentation in, the documentation I requested, it would have been in the subpoena. So I think the case stops are not random traffic stops. They're done as a pretext because clearly there's intelligence that they're receiving. I mean, it's no coincidence that Ms. Betancourt was stopped twice by the same task force in the same corridor. What do you have to support this allegation? Well, I think the first time she was, the facts of the case support it, the first time she was stopped, all of the occupants of the van were removed at the roadside. And this is at one in the morning and they're all women. And they bring backup troopers from the task force. They disassemble. They asked for consent to search. She gave them consent to search the van. They didn't search it. They disassembled it. They unscrewed panels. They were on the roadside for nearly an hour and they found nothing. And they let them go. And they let them go. Right. And no documentation. The intelligence wasn't very good. No documentation of that was ever produced. Those are the magic words, aren't they? Am I free to go? Pardon me? Those are the magic words, aren't they? Free to go. Yes. The second time. Let's assume it's pretextual. Does it really matter if you can find a traffic violation? Well, I think the answer to that is then if it is pretextual, why don't they just say that's why they stopped them? Why do they lie? It's actually dishonest and lacks candor to the district court to come in and say this is the only reason we did the stop was because a license plate light was out. I mean, had they had intelligence, it's a little bit different from my perspective in terms of the discovery that I'm entitled to. And had they said that, maybe we wouldn't be here. Maybe it would have been a different outcome at the suppression hearing. Or maybe it would have been the same outcome, but I it's a license plate light out. It's six miles over the speed limit. That was the reason for the January stop. And then in the second stop, they say, well, we recognized her from the first stop and that gave us reasonable suspicion, which is sort of ridiculous because no drugs were found in the first stop. So they used the first stop to say it gave them suspicion for the second stop. We get no documents, no discovery, no contact. I'm unable to cross-examine about the stop is Brady. They brought this witness to the suppression hearing. I didn't subpoena Trooper Moonen. They brought Trooper Moonen just to show that there was an initial stop and that somehow that created suspicion. One of the other issues, I'm trying to be careful about my time, that I raised that goes only to my client is the safety valve sentencing issue. And I don't know if the court wants me to address it, has questions about it. At the sentencing for Ms. Moonen, the district court was under the impression that he had to apply the guideline range after application of the safety valve because the advisory notes say shall. And the district court really raised this issue at the time of sentencing. It was an anticipated issue by me. I simply argued that a reasonable sentence is something less than 70 months. Based on her circumstance, she's a single parent. The district court's understanding at that time, and I think I mentioned this case last month, citing an unpublished January decision by this court saying that once you apply safety valve, then it's a Booker reasonable sentence analysis. So that was another issue that I addressed. Very good. Thank you. Good morning, Your Honors. May it please the Court. My name is Christina Wildeveld on behalf of Ms. Granillo. Ms. Granillo was a passenger in the vehicle that was stopped on February 2nd, 2006. At that time, the officers approached the vehicle. They went to the passenger window, asked for her identity and asked for her driver's license and asked her to exit the vehicle. It was 1025 at night on a cold February morning in the desert between California and Las Vegas. She stood on the side of the road. They separated the two and they did not question her about the license plate. They questioned her about where she was going, what she was doing, where she was headed to and why she was with the driver of the vehicle. It was a pretext stop at best. There was no stop based on reasonable suspicion. No ticket was issued for the license plate and there was no picture taken of the license plate. Your Honors, I have a picture of my client in which she is wearing a gray sweatshirt on a cold February morning. They say that is reasonable suspicion to ask to search her and search her body. It was a cold February morning, or I'm sorry, late in the evening. The January stop was in the morning. There's no reasonable suspicion to ask to search a woman when she is wearing a sweatshirt in the winter. Your Honors have seen the picture. There's no indication in that picture that there's anything suspicious about what she's wearing. It was a ticket violation that they were stopping her on. It was because they said that she was suspicious. I'm sorry. It was a pretextual stop and they searched her because she looks suspicious. But Your Honors have seen the picture and there's nothing suspicious about what she appears that morning or how she appears that morning. The stop that was in January could not have led to any suspicious activity given the fact that they disassembled the vehicle and they did not find anything. As Ms. Rasmussen pointed out, there had to have been some kind of intelligence that was alerting the officers to this vehicle that was traveling that evening. Okay. I think we have your argument in hand. Thank you. Good morning. May it please the Court, Elizabeth Olsen on behalf of the United States. The traffic stop here was lawful and the officer's actions at every stage during the duration of the stop was both lawful and reasonable. I'd like to make... Suspicious about a gray sweater? I don't think there's anything in the law about the gray sweater. And if you look at what the officer did from the beginning, first thing he did, it was a lawful traffic stop. I mean, the district court found that the only credible evidence was that the license plate was out and therefore the stop was lawful. He approached the car and it's true that the first thing that happened when he approached the car on the passenger side is that he recognized the driver from this previous stop three weeks ago. Now that, in the officer's mind, and I think under the law, it is a can be taken into account. But even if you disregard that, if that's problematic, disregard the earlier stop and look only at what the officer did. What did the earlier stop... How did the earlier stop contribute? Well, I think what Officer Moonen and Officer Owens testified about the earlier stop is that they had stopped the defendant's car, got some inconsistent stories from the people about where they were headed. They were... Officer Moonen testified that he thought it curious that they were driving across the state and one of the passengers in the car was dressed in very light clothes, summer weather clothes, and the others were in very heavy clothes, which if you're traveling together in a car, you know, either the heat's on or the air conditioner's on, but he found that suspicious. They got consent to search the vehicle and didn't find anything except for an empty roll of duct tape in the back seat and some air fresheners. After that, after the passengers left, after the folks left in the rented van, the officers were talking about it and they were just sort of debriefing themselves about what had occurred. And they said, you know, there was the passengers were wearing big baggy clothing and there was an empty roll of duct tape in the back seat. I wonder if they were body packing. I bet they were body packing. So that's at best a hunch. That's... Well, it's based on their, it's based on not only their training, but their experience. I mean, these officers are 20-year, you know, 20-year veterans and they've seen all of this before. And the empty roll of duct tape combined with the very baggy clothing was a conclusion that they reached in hindsight. But... An educated hunch, but a hunch. An educated hunch. My point is that even if that's problematic for the court, it can be taken completely out of the equation and nothing that Trooper Owens did... Okay, take it out of the equation. He walks up to the car. He asks the drivers and the passengers for their IDs, which he's entitled to do. He asks the driver to get out of the car, which he's entitled to do. There's no suspicion, no level of suspicion that's necessary for that. He sees on the registration... Why is it necessary to get the passenger's license? I mean, obviously the passenger doesn't, isn't responsible for the taillight or the... No, that's true. And I don't know that it's... To be a passenger without a driver's license. No, and she in fact said that she didn't have any ID and she gave him a fake name besides that. But, you know, but this testonada held that it's okay for an officer in a routine traffic stop to ask for identification from both the driver and the passengers, and that's based on the Supreme Court's decision in Hibble, that there's just simply no Fourth Amendment question there. So he asks them for ID and he asks the driver to get out of the vehicle, which again he's entitled to do, and that is United States versus Williams, which is based on Maryland versus Wilson. He then questions... He then has a very brief conversation with the passenger and asks her where they're going. Now that's permissible. Again, no level of suspicion is needed to ask to inquire about travel plans of both the driver and the passenger, and that's Chavez, Venezuela. Other circuits have agreed with that as well. At that point, the passenger says, we're on our way to Mesquite, Nevada, because the driver's husband's been in an accident and he's in the hospital. This strikes the officer as curious. Does he know there's no hospital in Mesquite? He believes that there's no hospital in Mesquite. I will say the record, it's never clarified in the record whether, when, there is now a hospital in Mesquite. There is. There is. And actually at the suppression hearing, the officer testified that he had since learned that a hospital had opened in Mesquite. He wasn't clear on whether it was open at the time of the stop. If I can step outside the record, according to their website, it opened 18 months before this stop. But regardless, the officer didn't believe, didn't know that there was a hospital in Mesquite. But even then, so he says, okay, fine. He gets her name. He walks back to the back of the car, and Ms. Betancourt, the driver, voluntarily initiates a conversation. Now, the district court, that is a factual finding that the district court made repeatedly. Pages 71, 72, 73 of the excerpt of record, he says Ms. Betancourt voluntarily initiated a conversation and told him that they were in a rush to get to Salt Lake City, Utah, because her husband had been in an accident and was in the hospital. Is the timing problematic here? They waited to make an arrest until the entire time it's going to take both sides to argue this case. Well, I think that to that point, I mean, what we have is 23 minutes between the initial stop and the arrest. So there is a 23-minute period, and I think that's probably the reason why we're here on that issue, because 23 minutes is longer than 14 minutes. But again, the district court made a factual finding, and this is a record, that there was a considerable permissible delay that was caused by Ms. Betancourt's voluntary statements to the officer. When he walked to the back of the car, she was distraught and upset and said, I've got to get to Salt Lake City because my husband's in the hospital, she's having this conversation with him, and so he has a conversation with her. And I don't think that there's anything unreasonable, in particular because all the testimony was that she was distraught and upset, combined with the fact that the story that she's telling him is inconsistent with what the passenger just told him about where they were going. So he asks her a couple of questions about this. Well, in response to that, she doesn't know what hospital he's at in Salt Lake City. She doesn't know the name of the person. She says somebody called her on the phone to tell her that her husband was in the hospital in Salt Lake. She doesn't know who that person was. She doesn't know how she's going to find him when she gets there. So she's telling this story, which is inconsistent with what the passenger said, and doesn't make a whole lot of sense on its face. But even then, he isn't doing anything that he's not authorized to do. Another officer arrives at about the same time, and he says, okay, Detective True, I think is how you pronounce his name, talk to her. I'm going to go run there. He goes back to the patrol car to run the license and registration and wants and warrants. The car is not registered to the driver. nor to the passenger. And that is a factor that this court has said can be a factor in reasonable suspicion. But frankly, the reasonable suspicion at this point hasn't even come into play, because what we've got is, when an officer asks for registration, and the registration and neither the driver nor the passenger can establish that they're authorized to drive the vehicle. That justifies the prolongation of the contact. It justifies checking things out. Absolutely. Absolutely. So Trooper Owens is in the patrol car, running the plates, and then Trooper Martin arrives, and he goes and talks to the passenger. Now, if at any point we've gotten to a point where you need reasonable suspicion for prolonging, the record isn't clear when that records check was done, whether that was before or after the drugs were discovered, taped to Ms. Granillo. But at that point, what the officers have is two people driving a car that they can't prove they have the right to drive, giving inconsistent stories about where they're going, which in the officer's mind, neither one of which makes any sense, okay? So he's running the license plate. The Trooper goes up to the Trooper Martin, approaches Ms. Granillo on the passenger side, asks her out of the car, which is permissible under Maryland v. Wilson. Officers in a routine traffic stop can order all passengers in a vehicle out of a car. She steps out of the car, and she's wearing these big baggy clothes. It is late at night on a rural road, and he says, can I pat you down? He doesn't pat her down. There is no pat down here. Now, yes, officers need reasonable suspicion to pat a suspect down without their consent, but there's no level of suspicion that's needed to request someone's consent to a search. That's Florida v. Royer. Now, and in fact, the standard in Florida v. Royer is you can ask the question so long as it's understandable that the person can decline, so long as there isn't a presumption or an assumption that they're being compelled. And in this case, clearly there was no such assumption, because Ms. Granillo declined. I mean, she said, no, you can't search me. You're a guy. And he said, well, hey, I'm just worried about weapons. And she opens her jacket and says, I don't have any weapons. And he says, well, what about the waistband? She lifts up her sweatshirt three inches, and he sees a rectangular bulge on the front of her waistband, which turns out to be tar heroin. She says that's just fat. She says that's just fat. So at that point, she has declined to give her down, and stated that the reason for that is because the officer is a man. He goes back to talk to Trooper Martin, and the record is not clear whether the records check has come back yet. So we don't know whether the stop at this point has been prolonged at all past the normal duration. Perhaps it has. If it has, there's been a lot of stuff going on that would justify that. But he says to Trooper Martin, I think she's body packing. She won't let me search her because I'm a male trooper. Can we get a female trooper here? Ms. Bentoncourt hears that, realizes that the game is up, and says, I'll tell you what's going on. She's got drugs. Obviously, once she calls Ms. Granillo over, shows them, shows the officers the drugs, at that point, of course, they have probable cause to arrest. Let me go back to the original stop. What's the statute that was violated with this traffic light, or the license light that was on? That's actually, the defendants didn't challenge the initial stop below, and so that's not in the record. But I can step outside the record and tell you that Nevada statute. I just wanted a citation, if you have it. It's Nevada revised statute 484. I'm sorry, what? Every passenger car needs to be equipped with a white light near the license plate. The reason I ask is because the district court has sort of an odd, makes sort of an odd statement in its factual findings that the original stop, in our case for the burned out license plate light, appears to have been a valid stop. It doesn't say it was. No. And what, I mean, what he said is that the only credible evidence before the court was, and that's on page 71, the only credible evidence before this court is that the license plate was burned out and that Trooper Owens observed it and made the stop. Right. There's just no citation to the, usually you have a citation to the statute or something. Yes. Yeah, he didn't, although the initial stop, you know, the defendants below didn't actually challenge the initial stop as a, they sort of made a couple of implications that it was pre-textual, which of course doesn't matter, because under Wren the subjective motivation is a valid stop. Well, yeah, if you got a valid stop. Yeah. Yeah. And there, and that was that the district court did make a finding that the only credible evidence before him was that the light was burned out and that. Right. I understand that part of it. I just didn't see a citation to what exactly was being violated. Yeah. And that's, that's the statute. The other two points that the defendants make on appeal are contained within the, within the appellate waiver and their plea agreements. So I'm not, I'm not, I don't want me to address them. I'm happy to in particular with the sentencing issue. And I, and I would just point out that it's true that at the sentencing hearing, initially the district court said, I have a question here about the safety valve. She qualifies for the safety valve, but the safety valve statute says that if the safety valve applies, the district court shall impose a sentence within the sentencing guidelines. How do I get, does that mean that the guidelines are mandatory? And both the defendant and the prosecution said, we don't think so. I mean that, you know, and now there is the, the, this court has decided that question and that was excuse me, Cardina Suarez. And that had already been decided, but apparently neither the district court nor either party was familiar with that case. And so they had a conversation about it. Both sides said, well, under Booker, you know, the guidelines are advisory period, end of story. And then the judge said, well, but does Booker even apply? Because this is a downward, not an upward. And, and the prosecutor said, I've never heard of anything after Booker where the guidelines are mandatory. And the judge said, well, maybe I should throw this up to the Ninth Circuit and have them decide it. And the prosecutor said, well, if this is really an issue, we've got no problem with you making it an appeal issue. If you would impose a different sentence, go ahead. But the parties in the plea agreement jointly recommended a low-end guideline sentence of 70 months. And he gave it. And that's what he gave. And the defendant waived her right to appeal, waived her right to appeal that sentence. On the subpoena question, you know, subpoenas in criminal cases just simply aren't to be used for discovery. And, and that's what the defendants are attempting, were attempting to do with it here. I will note, and I noted this in our brief, that this new issue that's being raised on appeal about how this subpoena somehow would have given them information about the January stop is, is simply incorrect because the subpoena was asking for statistical information over a two-year period, which the state testified at, or the state stated at the, at the motion to quash, the hearing on the motion to quash, that those statistics simply weren't available and it would have to be pulled together, which would mean going through something like 12,500 arrest reports to pull together all those statistics. But in any event, there was no request in the district court for specific information, certainly not in the context of that subpoena, for information about the January stop. There's not a discovery request in the criminal case in the district court? Yeah. Actually, I, I don't know. That, that issue I'm hearing for the first time about just sort of general discovery about the earlier January stop. I will say that in the, at the suppression hearing, the defendant questioned Trooper Martin, I believe, about the January stop and said that, and, and she had the computer, the dispatch printout from the January stop. And that is, um. What's his report request from that stop? I, um, I don't, I don't know. And, and, uh, I don't see anything, uh, certainly in the record on appeal on that question. That, um, that question wasn't, there, there was no, I don't believe there was any claim made in the district court of a discovery violation and certainly not in, um, in the opening brief on appeal. Okay. Thank you, counsel. Thank you. I'll start at the end and work back. The Trooper Martin at the very end, and it's on, I believe, page 261 of the appendix or the excerpts of record. Trooper Martin says, of course, we keep records of all of our contacts. That was the first time we had been able to eke out of anyone that they had any accountability. The prior testimony earlier was that they made their own  wanted to patrol and basically didn't report to anyone. It common sense tells us, because obviously they're federally funded, that they must keep records and they must have statistics. So Trooper Martin finally at the end of the suppression hearing said, yes, yes, we keep records of all contacts. That was never produced to us. And I think what the government doesn't address at all is that, why is that not something that the government had to produce under Brady? It was a prior stop where no drugs were found. Clearly that would be Brady. The government has an obligation to produce that. We in the District of Nevada use joint discovery statements. They're executed early on in the case. And the government has an ongoing duty to disclose discovery that's material relevant and that meets the requirements of Brady. Clearly that, at a minimum, documentation of the January stop should have been produced. And it should have been produced, particularly when they brought the witness in to testify about it, to somehow, and at the last minute argue, well, this is what gave credence to the reasonable suspicion because he recognized her. That was their theme of how reasonable suspicion started. Going back to the stop, it is documented in the record. It's well documented. It is 13 minutes before anyone calls in the basic material, the license plate and the names of the driver. There is no dispute in this case that Ms. has never argued anything to the contrary. It's not an issue in this case. What is an issue is that they waited 13 minutes to verify that. The purpose of this stop was a license plate light out. And the district court said it appears to have been a valid stop because the government was never able to corroborate or provide any documentation that, in fact, other than Trooper Owen's testimony of that's why he stopped her, that, in fact, the light was out. They took photos of the car from every angle except the back. There's no photograph of the back, which would show that the license plate was not operable, which was the alleged reason for the stop. And that's why the district court made the finding that it did. And that's why the language is a little suspect. 13 minutes is not reasonable. The case law in this circuit is clear that you can, of course, you can engage in conversation while you are running the information. You can ask where are you going, point A, B. You can have that conversation with drivers and passengers while you're engaging in conduct that furthers the purpose of the stop. If there was a question about whether she had permission to use the vehicle, he should have put that in the computer immediately and then had the conversation with them as they went along. That's not what happened here. There was backup called. It was 13 minutes before the simple information was placed into the system. The, again, the testimony of the officers, the government is telling you that it's based on their experience in 20 years of training. But these officers, and I wasn't allowed to ask on cross-examination, have testified in other cases that the presence of an air freshener and a road atlas is indicative of drug trafficking. In another case, they've testified that the presence of fast food wrappers and a road atlas are indicative of drug trafficking. I might have those things in my car. They've testified that two keys on a key ring is indicative of drug trafficking. The problem is reasonable suspicion to these officers on this task force is whatever they want it to be. In this case, they say there's a license plate light out, although there's no photo of it. And then they say we recognize Ms. Betancourt, but she was stopped previously and there were no drugs. It's just whatever they want it to be and it's completely amorphous. Thank you. Thank you very much. Case just heard will be submitted and we will take a 10 minute recess, in which case we'll set up the telephone.
judges: Trott, Thomas, Hogan